Sam **DENOV** and Burl Lane, Plaintiffs-Appellants,

v.

**CHICAGO FEDERATION OF MUSICIANS, LOCAL 10–208 and American Federation of Musicians of the United States and Canada, Defendants-Appellees.**

No. 82–1681.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1982.

Decided March 31, 1983.

---

William A. Sidlinger, Chicago, Ill., for plaintiffs-appellants.

Joel A. Smith, Lutherville, Md., for defendants-appellees.

Before CUMMINGS, Chief Judge, PELL, Circuit Judge, and HOFFMAN, Senior District Judge.*

PELL, Circuit Judge.

Appellants Sam Denov and Burl Lane appeal from the district court's order granting the appellees' motion for summary judgment in an action brought under the Labor-Management Reporting and Disclosure Act of 1959 (the Act), 29 U.S.C. §§ 401–531, to nullify a dues increase approved at the 1980 convention of the American Federation of Musicians (AFM). The appellants first contend that the dues in-

* Walter E. Hoffman, Senior District Judge for the United States District Court for the Eastern District of Virginia, sitting by designation.

crease is invalid because the union's convention delegate selection system violates section 101(a)(1) of the Act, 29 U.S.C. § 411(a)(1), by giving small locals disproportionately greater representation than large locals. Second, they contend that the dues increase violates section 101(a)(3), 29 U.S.C. § 411(a)(3), which specifically governs the procedures for increasing dues.

## I. FACTS

Appellants Denov and Lane are members of the Chicago Federation of Musicians, Local 10–208 (CFM or the local) and of AFM, an international union, by virtue of the local's affiliation with it. In June 1980, when AFM held its convention, CFM had 11,156 members and was one of 526 local affiliates of AFM, which had nearly 300,000 members.

Article 5 of the constitution of AFM sets out the system for the selection of delegates by the locals for AFM conventions.

All locals of 200 members or less shall be entitled to one delegate. All locals of not less than 201 members and not more than 400 members shall be entitled to two delegates. All locals of more than 400 members shall be entitled to three delegates. A merged Local ... shall be entitled to one additional Delegate....

As a merged local, CFM was entitled to four of the 994 delegates at the convention. CFM's delegate strength thus was about one-tenth of what it would have been on a proportional basis. Although voice votes are the most common method of voting, article 5 also provides that proposals to change the bylaws may be subjected to a roll call vote if fifteen locals or thirty delegates demand it. In a roll call vote, each local may cast as many votes as it has members; thus CFM could cast 11,156 votes in a roll call vote.

On June 17, 1980, the delegates, by voice vote, approved a recommendation to amend their bylaws to establish minimum work dues of one percent of each member's scale wages. The proposal directed that one-half of this was payable to the international and one-half to the local. The amendment also

provided that the work dues of any local that were in effect as of July 1, 1980, would be increased one percent of scale wages. Prior to the convention, Local 10–208 levied work dues of two percent on its members; the effect of the implementation of this proposal was to increase work dues to three percent, of which one-half percent was due the international. No one at the convention requested a roll call vote.

The proposal also provided that a local could apply to the International Executive Board for waiver of the increases. The appellants say that since June 1980, about forty of the 526 locals have successfully petitioned for a waiver of the increases. CFM, however, has not petitioned.

On December 3, 1980, the appellants filed a three-count action against CFM and AFM. Count I asserted that the delegate selection system constituted a violation of section 101(a)(1) of the Act, which provides for equal voting rights for union members. Count II charged that the vote and dues increase violated section 101(a)(3)(A), which provides that a local cannot increase dues except by a secret ballot. Count III asserted a violation of section 101(a)(3)(B), which requires that a dues increase considered at a special convention be preceded by thirty days' notice. The appellants asked the court to enjoin the local from collecting its one-half percent and to require AFM to apportion delegates more closely to the size of the local.

On June 11, 1981, Judge Shadur dismissed Counts II and III, but denied the motion to dismiss Count I. *Denov v. Chicago Federation of Musicians, Local 10–208,* 517 F.Supp. 980 (N.D.Ill.1981). The court said that whether the convention representation scheme was "reasonable" under section 101(a)(1) was a question of fact that precluded dismissal. *Id.* at 985. The court held that success on Count II was precluded by our decision in *Ranes v. Office Employees International Union, Local No. 28,* 317 F.2d 915 (7th Cir.1963), which held that section 101(a)(3)(A) was inapplicable where the increase in dues payable to the local was attributable to action by the international

with which it was affiliated, as here. 517 F.Supp. at 986. Judge Shadur held that Count III was foreclosed because the convention was regularly scheduled, not special, and hence the section 101(a)(3)(B) notice requirement was inapplicable. *Id.*

On August 14, 1981, the case was reassigned to Judge Parsons. On August 19, both parties filed motions for summary judgment. On December 31, 1981, the district court granted the appellees' motion. The court held that section 101(a)(1) "did not set forth the structure of one-man one-vote for delegate voting of dues in an annual convention," and said that the delegate selection process was reasonable for purposes of the Act. The court entered final judgment in favor of the appellees on April 21, 1982. This appeal followed.

## II. JURISDICTION

Before reaching the merits, we must consider the appellees' claim, rejected by Judge Shadur, that the district court had no jurisdiction to consider the appellants' challenge to the convention representation system. The appellees contend that the appellants cannot bring an action under Title I of the Act, 29 U.S.C. §§ 411–415, because the claim is essentially one under Title IV, *id.* §§ 481–483. Because an action under Title IV is the exclusive remedy for a violation that comes within it, *id.* § 483, and because only the Secretary of Labor may bring a Title IV action, *id.* § 482, the appellants cannot maintain their action in this case if we hold that the case is predominantly governed by Title IV, *see O'Doherty v. Brotherhood of Railway, Airline & Steamship Clerks,* 618 F.2d 484, 486 (8th Cir.1980).

■ The test of whether a case is properly brought under Titles I or IV is whether the issues raised "basically relat[e] . . . to eligibility of candidates for office"; if they do, the case "fall[s] squarely within Title IV of the Act and [is] to be resolved by the administrative and judicial procedures set out in that Title." *Calhoon v. Harvey,* 379 U.S. 134, 141, 85 S.Ct. 292, 296, 13 L.Ed.2d 190 (1964); *accord, Driscoll v. International Union of Operating Engineers, Local 139,* 484 F.2d 682, 686 (7th Cir.1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974).

■ We hold that the district court properly ruled that it did have jurisdiction. The subject matter of Title IV is the election of union officers. By contrast, the appellants here challenge a dues increase and the selection of delegates who voted on the increase. Title I specifically governs the increase of dues, 29 U.S.C. § 411(a)(3), and also ensures the right of every member of a union "to participate in the deliberations and voting upon the business of [membership] meetings," *id.* § 411(a)(1). Title IV has no language referring to increases of dues, participation in voting on matters other than election of officers, or the election of delegates. Thus Title I applies to the facts of this case much more directly than Title IV. *See Gordon v. Laborers' International Union,* 490 F.2d 133, 137 (10th Cir. 1973), *cert. denied,* 419 U.S. 836, 95 S.Ct. 63, 42 L.Ed.2d 62 (1974) (upholding Title I jurisdiction in a case with facts similar to those present in the instant case).

None of the cases cited by the appellees are inconsistent with this view. In *O'Doherty v. Brotherhood of Railway, Airline & Steamship Clerks,* 618 F.2d 484, 486 (8th Cir.1980), the court, in a case challenging the union's system of representation on an intermediate board, held that Title IV governed because 29 U.S.C. § 481(d) specifically governs the election of officials to union intermediate bodies. Similarly, the court in *Kempthorne v. United Transportation Union,* 457 F.2d 551 (7th Cir.1972) (per curiam), held that Title IV governed a challenge to the nonproportional voting system for electing the chairman of a union committee, saying that the committee was an intermediate body governed by 29 U.S.C. § 481(d). Finally, in *Pruitt v. United Brotherhood of Carpenters,* 518 F.Supp. 61, 63 (N.D.Ga. 1981), the court held that Title IV governed where the claim was that a union official was improperly elected and ineligible to hold office, because the case involved a matter of qualification for office.

## III. PROPORTIONAL REPRESENTATION

Section 101(a)(1) of the Act provides that "[e]very member of a labor organization ... shall have equal rights and privileges ... to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws." The appellants contend that this section requires that delegate representation for AFM conventions be nearly proportional to the size of the membership of each constituent local. Both district court decisions stated that the issue in the case was whether the representation system was "reasonable" under section 101(a)(1).

The appellees argue that section 101(a)(1) has no application because by its terms it applies to membership meetings, not to delegate conventions. They contend that section 101(a)(3), 29 U.S.C. § 411(a)(3),[1] is the only section that applies to dues increases and they note that that section makes no mention of any requirements for the selection of those who vote on dues increases. Neither Judge Shadur nor Judge Parsons addressed this question.

The few cases that have considered delegate selection systems have suggested that the standards of section 101(a)(1) apply even though the section itself does not. In *Gordon v. Laborers' International Union,* 490 F.2d 133 (10th Cir.1973), *cert. denied,* 419 U.S. 836, 95 S.Ct. 63, 42 L.Ed.2d 62 (1974), the court said that section 101(a)(1) did not apply to the selection of delegates to a district council because the section governs membership meetings only. It held that therefore Congress did not intend to impose a proportional representation system on international unions. Nevertheless, in upholding the delegate system, the court referred to the "reasonable rules and regulations" language of section 101(a)(1), implying that the delegate system was reasonable. *Id.* at 137–38.

In *Rota v. Brotherhood of Railway, Airline & Steamship Clerks,* 489 F.2d 998 (7th Cir.1973), *cert. denied,* 414 U.S. 1144, 94 S.Ct. 896, 39 L.Ed.2d 99 (1974), we noted that section 101(a)(3) is silent concerning the procedures that must be followed in voting on a dues increase. We commented, however, that "[n]ecessarily, ... the word 'vote' connotes a fairly determined expression of the will of the union membership and a reliable and accurate count thereof," *id.* at 1004, and we remanded the case for further proceedings. In considering our remark, the district court on remand concluded that section 101(a)(3)(B) incorporated the protections guaranteed by section 101(a)(1). *Rota v. Brotherhood of Railway, Airline & Steamship Clerks,* 64 F.R.D. 699, 702 (N.D. Ill.1974). In addition, the Supreme Court has suggested that section 101(a)(3)(B) contains an implicit fairness-of-representation requirement:

1. 29 U.S.C. § 411(a)(3) provides:

(3) Dues, initiation fees, and assessments. Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959 shall not be increased, and no general or special assessment shall be levied upon such members, except—

(A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot; or (B) in the case of a labor organization, other than a local labor organization or a federation of national or international labor organizations, (i) by majority vote of the delegates voting at a regular convention, or at a special convention of such labor organization held upon not less than thirty days' written notice to the principal office of each local or constituent labor organization entitled to such notice, or (ii) by majority vote of the members in good standing of such labor organization voting in a membership referendum conducted by secret ballot, or (iii) by majority vote of the members of the executive board or similar governing body of such labor organization, pursuant to express authority contained in the constitution and bylaws of such labor organization: *Provided,* That such action on the part of the executive board or similar governing body shall be effective only until the next regular convention of such labor organization.

Section 101(a)(3)(B) is a part of Title I, entitled the "Bill of Rights of Members of Labor Organizations." This Title guarantees to every member of a labor organization equal rights and privileges to vote, to attend meetings, and to participate in the deliberations and business of such meetings. Section 101(a)(3)(B) forms a part of this framework by requiring participation by all members, either directly or through their elected representatives, on certain union matters thought to be of special importance.

*American Federation of Musicians v. Wittstein,* 379 U.S. 171, 181, 85 S.Ct. 300, 306, 13 L.Ed.2d 214 (1964).

■ We agree with the appellees that section 101(a)(1) by its language does not apply to delegate representation, and that section 101(a)(3) is the only section that does. Nevertheless, we agree with the district court in *Rota* that section 101(a)(3) incorporates the safeguards of section 101(a)(1). Thus the inquiry is identical whether section 101(a)(1) or 101(a)(3) is applied: was the convention representation system reasonable?

We believe that this is the proper interpretation of our statement in *Rota* that "the word 'vote' connotes a fairly determined expression of the will of the union membership and a reliable and accurate count thereof." 489 F.2d at 1004. Imbuing section 101(a)(3) with the reasonableness requirement of section 101(a)(1) is the only way to ensure that the purpose of section 101—"to shield the union membership from arbitrary, autocratic, and despotic control by union officers and leaders," *Burroughs v. Operating Engineers Local Union No. 3,* 686 F.2d 723, 727 (9th Cir.1982), and to "prevent[ ] the leadership of a union from imposing arbitrary financial exactions unilaterally on its membership," *id.* at 728—is fulfilled.

Accordingly, we must consider whether Title I was designed to require proportional delegate representation at union conventions. The only Supreme Court case to have considered the application of section 101 to weighted voting systems is *American Federation of Musicians v. Wittstein,* 379 U.S. 171, 85 S.Ct. 300, 13 L.Ed.2d 214 (1964). There, union members challenged AFM's roll call procedure in which each local casts as many votes as it has members, asserting that each delegate could cast only one vote regardless of the size of the local. They contended that AFM's system was prohibited by the requirement of section 101(a)(3)(B) that a dues increase be approved by "majority vote of the delegates voting at a regular convention." The Court held that a weighted voting system was permissible under the statute: "We think ... that the vote of an elected delegate may reflect the size of his constituency ...." *Id.* at 183, 85 S.Ct. at 307.

*Wittstein* concerned the reverse of the situation here, however, and thus its relevance to this case is limited. The Court considered a claim that a nonproportional system was required; the claim here is that a proportional system is required. The only significance of the case is its tacit acceptance of nonweighted voting and the Court's remark that "Section 101(a)(3)(B) ... authorizes a representative system of government and does not require a town meeting for action by an international or national union." *Id.* at 182, 85 S.Ct. at 306 (footnote omitted).

The one case directly on point is *Gordon v. Laborers' International Union,* 490 F.2d 133 (10th Cir.1973), *cert. denied,* 419 U.S. 836, 95 S.Ct. 63, 42 L.Ed.2d 62 (1974). In that case, locals with fewer than 500 members were allowed two delegates, and locals with 501 to 1000 members were allowed three delegates. The court rejected the claim by members of a local with over 600 workers that the system violated section 101(a)(1) because it gave small locals greater proportional representation than large locals. The court, citing *Wittstein's* "town meeting" language, held that section 101(a)(1) "was not intended to impose a proportional representation system on international unions or their intermediate bodies," 490 F.2d at 137, and further stated that no other statutory provision did either, *id.* at 137–38. The court concluded that

disputes between an international and its locals were best left to internal settlement. *Id.* at 138. *See O'Doherty v. Brotherhood of Railway, Airline & Steamship Clerks,* 618 F.2d 484, 487 (8th Cir.1980) (suggesting in dictum that section 101(a)(1) did not make invalid a union rule providing for one vote for each local regardless of size).

With the dearth of case law on the application of Title I to delegate selection rules, we must examine the legislative history of the provision. Because Title I as enacted was written largely from the floor of the Senate, Congressional expression of the intent behind some of the sections, such as section 101(a)(3), is, in the words of one commentator, "almost nil." Rothman, *Legislative History of the "Bill of Rights" for Union Members,* 45 Minn.L.Rev. 199, 212 (1960). Nevertheless, the evolution of the section that became section 101(a)(1) demonstrates that Congress did not intend to require proportional voting.

The version of Title I proposed by Senator McClellan provided that the vote of delegates at a convention "shall be numerically equivalent, or proportionate, to the number of members of [each] constituent unit." S.1137, 86th Cong., 1st Sess., § 104(2); *see* 105 Cong.Rec. 2407–17 (1959) (remarks of Sen. McClellan). The Senate Labor Committee, however, reported out the Kennedy-Ervin bill, which contained no such provision. S.1555, 86th Cong., 1st Sess., 105 Cong.Rec. 5253 (1959).

While the Senate was considering S.1555, Senator McClellan offered an amendment on the floor providing for "identical voting rights and equal protection of [a union's] rules and regulations." 105 Cong.Rec. 5810 (1959) (remarks of Sen. McClellan). The Senate passed this bill. *Id.* at 5827. This version was short lived, however; Senator Kuchel and others proposed a substitute amendment, which the Senate passed overwhelmingly. *Id.* at 6030. The new version eliminated the "identical voting rights" language and substituted the "reasonable rules and regulations" language of the section as enacted. Congress then enacted the bill into law with the wording it now has. *Id.*

at 16435 (Senate passage), 16653–54 (House passage). Thus Congress rejected the version of Title I requiring a one-member, one-vote delegate system.

Further support for the view that, in passing the Act, Congress did not intend to require proportional representation at conventions of national or international unions may be found in the regulations for Title IV. These regulations, promulgated by the Office of Labor-Management Standards Enforcement of the Department of Labor, state that:

[T]he structure of representation of the membership is a matter for the Union to determine in accordance with its constitution and bylaws. *There is no indication that Congress intended, in enacting Title IV of the Act, to require representation in delegate bodies of labor organizations to reflect the proportionate number of members in each subordinate labor organization represented in such bodies. . . .* Congress did not attempt to specify the organizational structure or the system of representation which unions must adopt.

29 C.F.R. § 452.127 (1982) (emphasis added). There is no reason to believe that Congress intended to adopt a different standard for voting under Titles I and IV.

Although few Congressional expressions of intent about specific provisions of Title I are available, the general purpose of Title I is apparent. It was designed "to further the Act's primary objective of ensuring that unions would be democratically governed and responsive to the will of their memberships." *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982). On the other hand, the "general congressional policy [is] to allow unions great latitude in resolving their own internal controversies." *Calhoon v. Harvey,* 379 U.S. 134, 140, 85 S.Ct. 292, 296, 13 L.Ed.2d 190 (1964). With respect to specific provisions of Title I, section 101(a)(3) is designed to prevent union officers "from imposing arbitrary financial exactions unilaterally on its membership." *Burroughs v. Operating Engineers Local Union No. 3,* 686 F.2d 723, 728 (9th Cir.1982). As for section 101(a)(1),

"[t]he principle ... is that those who are bound, as members, by the union's decisions should have the opportunity to take part in the deliberations." Cox, *Internal Affairs of Labor Unions Under the Labor Reform Act of 1959*, 58 Mich.L.Rev. 819–34 (1960).

■ With the purpose and legislative history of Title I in mind, we hold that the delegate selection system is reasonable. First, given that Congress did not require a one-member, one-vote system of representation, the system is permissible as long as some meaningful representation is achieved. Here, CFM did have four delegates at the convention. Second, the AFM constitution allows for the expression of true majority will through roll call votes for changes in the bylaws (such as dues increases). Although it is true that no one delegate or local can demand a roll call vote, the requirement of needing fifteen locals or thirty delegates does not seem unduly burdensome. The union is entitled to devise a roll call procedure that is not so easy to comply with that *every* matter is subject to a roll call vote and its attendant delay upon the demand of a small number of locals or delegates. Furthermore, the appellants do not even contend that the delegates from Local 10–208 asked for a roll call vote, much less that they were precluded from doing so.

## IV. OTHER ISSUES

### A. *Nonuniformity of Application*

■ The appellants contend that the dues increase violated section 101(a)(3) because the AFM International Executive Board was empowered to waive the dues increase in the case of a particular local upon the application of that local. The appellants cite *Burroughs v. Operating Engineers Local Union No. 3*, 686 F.2d 723 (9th Cir. 1982), as invalidating a dues increase where the union board had unlimited discretion to impose or not to impose a dues increase.

In *Burroughs*, the membership approved a procedure whereby dues would automatically increase as wages increased, subject to the union board's power to suspend all or part of the increase at its sole discretion. The court held this invalid because it gave the union officers "nearly unfettered discretion to determine the size of any increase in dues." *Id.* at 729. The fault with the procedure was that the union members in effect had delegated to union officers their power to approve or disapprove of a dues increase. "The union membership is never provided an opportunity to vote—yes or no—whether dues shall increase, either absolutely or as a percentage of earnings." *Id.*

By contrast, in the instant case there was no such delegation of power. The dues increase was uniform and specific and was required to go into effect. Union officers had only limited discretion to waive the increase: a local had to take the initiative, and thus the discretion was only on a case-by-case basis. Union officers had no power to waive the increase for locals that did not apply for waiver.

The inapplicability of *Burroughs* is further shown by the Ninth Circuit's decision upholding a dues increase subject to the union president's discretion to approve individual exceptions to the imposition of a minimum rate. In *Mori v. International Brotherhood of Boilermakers*, 653 F.2d 1279 (9th Cir.1981), *cert. denied*, 454 U.S. 1147, 102 S.Ct. 1011, 71 L.Ed.2d 301 (1982), the court, stating that the question was whether "a dues increase ... subject to suspension at the discretion of the president is within the range of substantive choices a convention may make without violating § 101(a)(3)," *id.* at 1284, held that such an increase was proper. The court said that the case was not one where the international was enriching itself at the expense of unpopular locals, because the locals received most of the dues. Because the increase was voted on and adopted at a convention at which the concerned local was represented, and because the increase was primarily for the financial benefit of the locals, the court held that the increase did not run afoul of section 101(a)(3). *Id.* at 1284–85.

The instant case is almost identical to *Mori*. Here, only one-half percent of the

dues was payable to the international; the rest was payable to the locals. Thus, there is no sense that the international or small locals were seeking to enrich themselves at the expense of large locals like CFM.

The appellants further argue that the one percent increase for locals that had work dues as of July 1, 1980, is invalid because it discriminates against locals with work dues structures. We reject this contention. In *Mori,* the court approved a work dues levy imposed only on one small division of workers (field construction members). The court noted that the dues went only to the locals, not the international, and concluded that the international proposed this levy because it believed that field construction locals needed the money. 653 F.2d at 1284–85.

In the instant case, this particular claim apparently was not raised until this appeal, and thus there was no opportunity to develop the facts about why the proposal was written in this manner. Nevertheless, we find no fault in the passage of the dues increase because the dues went to the locals. We will not interfere with the union's decision to give extra money to locals with existing dues structures where "[t]he record does not reflect an attempt on the part of a majority of the international to exploit or discriminate against [a] minority." *Mori,* 653 F.2d at 1285.

B. *The Locals' Autonomy*

Although their briefs are unclear on this point, it appears that the appellants argue that the one percent levy interferes with the locals' rights to set their own rates. Specifically, they note that the effect of the provision raising the dues rates of locals with existing dues structures is to "freeze" the rate of dues at the rate in effect as of July 1, 1980.

We find no impropriety. In *Ranes v. Office Employees International Union, Local No. 28,* 317 F.2d 915 (7th Cir.1963), we held that an international union could raise the minimum rates payable to the local without a secret ballot of the members of the local. *Id.* at 918. The action of the international in setting the dues of the local

union is within the power of internationals as recognized in *Ranes.*

## CONCLUSION

For the foregoing reasons, the decision of the district court is affirmed.